**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ANDY GIL, and RAFAEL HERNANDEZ, on
behalf of themselves and all other similarly
situated;

       *Plaintiffs,*

   v.

PIZZAROTTI, LLC; ATLANTIC
CONTRACTING OF YONKERS, INC.; JOEL
ACEVEDO; IGNAZIO CAMPOCCIA;
GIACOMO DI'NOLA a/k/a GIACOMO DI
NOLA; JOHN DOE CORPORATIONS 1-10
and RICHARD ROES 1-10;

      *Defendants.*

**Case No. 19-CV-03497 (MKV)**

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

John Ho
Jennifer Queliz
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Telephone:     (212) 883-4927
Facsimile:     (866) 202-1728
jho@cozen.com
jqueliz@cozen.com

*Attorneys for Defendants*
*Pizzarotti LLC, Ignazio Campoccia,*
*and Giacomo Di'Nola*

## Table of Contents

Page

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ..................................................................................... 2

    I.      PZ and its Role as Construction Manager on the Jardim Project ........................... 3

    II.    PZ's Arm's Length Relationship with Atlantic and the Time and Material Contract Entered Into Between the Parties ............................................................ 5

    III.   Relevant Facts to Joint Employment Status ..................................................... 6

THE LEGAL STANDARD ................................................................................... 12

ARGUMENT ..................................................................................................... 14

    I.      The PZ Defendants Were Not The Employers Of The Atlantic Workers. ........... 14

           A.    PZ Did Not Recruit, Hire, Fire or Set Atlantic Employees Rate of Pay ... 15

           B.    PZ Did Not Control The Work Schedules or Terms & Conditions of Atlantic Workers' Employment ................................................................ 19

           C.    PZ Did Not Maintain Atlantic Workers' Employment Records .............. 23

           D.    Mr. Di'Nola and Mr. Campoccia Were Not The Employers of the Atlantic Workers .............................................................................................. 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................12

*Barfield v. New York City Health & Hospitals Corp.*,
537 F.3d 132 (2d Cir. 2008)....................................................................................14

*Carter v. Dutchess Community College*,
735 F.2d 8 (2d Cir. 1984)................................................................................. *passim*

*Godlewska v. Human Development Association*,
916 F. Supp. 2d 246 (E.D.N.Y. 2013) .....................................................................17

*Hart v. Rick's Cabaret International, Inc.*,
967 F. Supp. 2d 901 (S.D.N.Y. 2013).....................................................................14

*Hugee v. SJC Grp., Inc.*,
No. 13 Civ. 0423 (GBD), 2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013) ..................16, 22, 23

*Jean-Louis v. Metro. Cable Commuications, Inc.*,
838 F. Supp. 2d 111 (S.D.N.Y. 2011).....................................................................15, 17, 22

*Martin v. Sprint United Management Co.*,
273 F.Supp.3d 404 (S.D.N.Y. 2017).......................................................................12, 13, 20

*Matter of Ovadia v. Office of Indus, Bd of Appeals*,
19 N.Y.3d 138 (2012) .............................................................................................13, 14, 20, 21

*Quintanilla v. A & R Demolitina, Inc.*,
No. CIV.A. H-04-1965, 2005 WL 2095104 (S.D. Tex. Aug. 30, 2005) .........................18, 19

*Spicer v. Pier Sixty LLC*,
269 F.R.D. 321 (S.D.N.Y. 2010) .............................................................................14

*Thomas v. River Greene Constr. Grp., LLC*,
No. 17 Civ. 6954 (PAE); 2018 WL 6528493, (S.D.N.Y. Dec. 11, 2018) .........................13, 24

*Zheng v. Liberty Apparel Co. Inc.*,
355 F.3d 61 (2d Cir. 2003)......................................................................................19, 21

**Statutes**

29 U.S.C. § 203(g) ..................................................................................................14

Fair Labor Standards Act ................................................................................................ 1, 13, 14

Family and Medical Leave Act ............................................................................................... 19

New York Labor Law ...................................................................................................... 1, 13, 14

**Other Authorities**

29 C.F.R. § 791.2 ...................................................................................................................... 14

29 C.F.R. § 791.2(d)(4) ............................................................................................................ 19

85 Fed Reg. 2820-01 ................................................................................................................ 18

Fed. R. Civ. P. 56(a) ................................................................................................................ 12

Rule 56.1 ....................................................................................................................... *passim*

"Joint Employer Final Rule Frequently Asked Questions" No. 4 available at
https://www.dol.gov/agencies/whd/flsa/2020-joint-employment/faq#4 (last visited July 16,
2020)...................................................................................................................................... 13

LEGAL\47463012\1

Defendants Pizzarotti LLC ("PZ"), Giacomo Di'Nola, and Ignazio Campoccia (collectively "PZ Defendants") respectfully submit this Memorandum of Law in Support of their Motion for Summary Judgment dismissing in their entirety Plaintiffs' claims under both the Fair Labor Standards Act ("FLSA") (Count I) and New York Labor Law ("NYLL") (Counts II and III).

## PRELIMINARY STATEMENT

PZ is a global construction company that serves as a construction manager (also commonly referred to as the "general contractor") for numerous construction projects in New York and elsewhere. Plaintiffs are employees of Atlantic Contracting of Yonkers ("Atlantic"), a subcontractor retained by PZ to provide carpentry and drywall finishing services (also referred to as "taping") on a large building construction project ("the Jardim Project") where PZ was acting as the general contractor.   Plaintiffs filed suit against the PZ Defendants, including two individuals employed by PZ, alleging they are jointly and severally liable for Atlantic's failure to pay them overtime under federal and state laws on a joint employer theory. The simple reality is that Plaintiffs named the PZ Defendants, not based on any facts supporting joint employment status, but in search of a deep pocket.

This case is about a traditional general contractor – subcontractor relationship in the construction industry, which has long been recognized as a bona fide independent contractor relationship. Under this typical arrangement, the general contractor contracts with a property owner to oversee a construction project that, depending on the size, often requires numerous trades and skills such as electrical, carpentry, drywall, and masonry. The general contractor's role is not to perform the actual substantive construction work in each of the many different trades necessary but rather to ensure, among other things, that the overall construction project is completed to meet the standards of the building owners and on the agreed-upon timeline by overseeing the different subcontractors. To perform its role, a general contractor must coordinate with each subcontractor

what work needs to be done, ensure the project is completed safety, and ensure the project complies with approved specifications and plans. PZ's exercise of these customary general contractor responsibilities on the Jardim Project, here, including by (1) removing a subcontractor employee from the worksite for failing to follow safety rules or for drinking on the job, (2) indicating what floors certain drywall work must be done, and (3) maintaining records reflecting labor hours for billing purposes is legally insufficient to establish joint employer status with Atlantic. To reach a different conclusion would turn the construction industry on its head and dramatically increase the liability of general contractors in the construction industry who routinely perform these duties.

The undisputed material facts in this case establish not a subterfuge relationship to avoid paying Atlantic employees overtime or any other impermissible means, but a bona fide independent contractor relationship between PZ and Atlantic with no common ownership, no interchange of employees, no continuing working relationship other than the worksite at issue, a lack of employment files maintained by PZ, and an arm's length negotiation with Atlantic for a common "time and material" contract. For these reasons, as discussed fully below, the Plaintiffs' claims should be dismissed in their entirety against the PZ Defendants.

## STATEMENT OF FACTS

The facts in this case are relatively straightforward as the PZ Defendants and Atlantic only worked together on a single worksite for a limited time period, and the day-to-day work of Atlantic foremen and employees from the time they arrived until they left was relatively consistent (as it was with other subcontractors at the worksite) in all legally relevant ways.  There is no genuine issues of dispute over the key aspects of this case including: the separate corporate structures of PZ and Atlantic; the arm's length "time and material" contract between PZ and Atlantic; Atlantic's recruiting, hiring, setting pay rates for its employees and the daily supervision of its employees by its foremen; PZ Defendants' role as the general contractor over its subcontractors including

Atlantic; and Atlantic's treatment and control of its employees without meaningful input or direction from the PZ Defendants including with respect to paying employees, keeping personnel records, maintaining workers' compensation insurance, and negotiating pay increases and/or addressing pay issues with its employees.

## I.      PZ AND ITS ROLE AS CONSTRUCTION MANAGER ON THE JARDIM PROJECT

PZ is part of the Pizzarotti Group, and a global construction company based in Italy which provides, among other things, construction management or general contracting services. (Defendants' Rule 56.1 Statement [hereinafter "Def. 56.1"], at ¶ 1.)  PZ maintains an office in New York, and at any given time likely has approximately three to ten contracts in New York alone where it serves as the construction manager (also referred to as a "general contractor"). (Def. 56.1 at ¶ 2-3.)

In September 2015, PZ entered into a construction management agreement with WC 28 Realty LLC ("WC"), the owner of a property located at 533-535 West 27th Street and 530-536 West 28th Street, New York, New York (the "Jardim Project").  (*Id.* at ¶ 4.)[1]  As construction manager / general contractor, PZ is responsible for managing the entire Jardim Project's construction schedule, cost, quality, and safety.  (*Id.* at ¶ 6.) For example, between July 2018 through February 2019, when Plaintiffs worked on the Jardim Project, PZ oversaw day-to-day operations, managed and coordinated numerous other subcontractors across different trades, and provided general oversight of the entire project. (*Id.*) As a general contractor, PZ was responsible for contracting all of the subcontractors needed to perform the necessary work based on the nature of the project which included the following skilled trades: carpentry work, taper work, electrical work, plumbing, electrical, window installation, HVAC, sprinkler systems, landscaping, signage,

---

[1] Construction of the Jardim Project is still ongoing and currently in its final stages. (*Id.*)

elevators, fire protection, parking systems, waterproofing, concrete resurfacing, and millwork. (*Id.* at ¶ 11.) In its capacity as general contractor, PZ oversaw all subcontractors to make sure they completed their contractual obligations on time, at or under budget, to WC's expected standard of quality, to coordinate among them when and what order the work must be done and ensure all work is done safety. (*Id.* at ¶ 6.) PZ, as general contractors normally do, develops the sequence of construction operations and a detailed schedule and budget to coordinate the work from the various subcontractors, while also establishing plans for project safety and security. (*Id.*)

To manage a construction project, PZ is not responsible for having its own employees perform any of the actual construction work. (*Id.* at ¶ 7.) Rather, the function of a general contractor is that PZ must maintain an appropriate number of PZ employees to oversee the various administrative components of the Jardim Project. (*Id.* at ¶ 9.) This primarily involves overseeing the work progress of subcontractors including but not limited to Atlantic and coordinating the work among the subcontractors to ensure they are working in the proper order, at the appropriate location and doing so in a safe manner. (*Id.*) Atlantic was one of four subcontractors with whom PZ contracted for carpentry, taping, and drywall work on the Jardim Project between 2015 and 2019. (*Id.* at ¶ 13.)

The primary PZ employees assigned to manage the Jardim Project whom were mentioned to any material degree in Plaintiffs' depositions are Ignazio Campoccia, as Project Executive, Roberto Maddedu, as Senior Project Manager, and Giacomo Di'Nola, as Project Engineer. (Def. 56.1 at ¶ 10.) Mr. Campoccia was responsible for liaising directly with WC.[2] (*Id.* at 10(a).) Mr. Maddedu was responsible for managing PZ's personnel, making sure the Jardim Project was developed as established by PZ's contract and the plans for the project, as well as making sure that

---

[2] In addition, Mr. Campoccia does speak not Spanish although he understands a little of it. (*Id.*)

all subcontractors, including Atlantic, executed their work according to the terms of the contract they signed with PZ, and followed the proper sequence of work needed to complete the entire construction project. (*Id.* at 10(b).)

Throughout the Jardim Project's construction, if WC was not satisfied with any specific subcontractor's work, Mr. Campoccia and Mr. Maddedu would contact the owner of the particular subcontractor and/or its foremen to address the issue. (*Id.*) Mr. Di'Nola, who acted as a personal assistant to Mr. Maddedu,[3] was responsible for various day-to-day tasks which included ordering materials, creating a timeline of construction tasks to be completed, making sure construction was completed according to plans, and handling invoices for subcontractors on the Jardim Project such as PZ. (*Id.* at 10(c).) Mr. Di'Nola began working for PZ shortly after graduating from college in 2018. (*Id.*) None of these PZ employees had any carpentry or drywalling/taping experience. (*Id.* at 76.)  Additionally, certain PZ employees, such as Mr. Dominique Paraison, Site Safety Manager, and Mr. Maurizio Sciacca, Quality Control Manager, performed discreet tasks relevant to safety and quality assurance. (*Id.* at 10(d)&(e).)

## II.     PZ'S ARM'S LENGTH RELATIONSHIP WITH ATLANTIC AND THE TIME AND MATERIAL CONTRACT ENTERED INTO BETWEEN THE PARTIES

PZ and Atlantic are separate and distinct legal entities that entered into a written contract (the "PZ-Atlantic Contract") in late June 2018 for Atlantic to perform carpentry, taping,[4] and drywall services on the Jardim Project. (*Id.* at ¶ 15.) PZ and Atlantic do not share common ownership. (*Id.* at ¶ 28.) Upon information and belief, Atlantic is owned by Joel Acevedo and David Gonzalez. (*Id.* at ¶ 29.) Neither of these individuals have any ownership interest in PZ and

---

[3] Mr. Maddedu does not speak English or Spanish well and Mr. Di'Nola translated for him. Many Atlantic employees did not speak English and Spanish was their primary language. (*Id.*)
[4] A taper prepares sheetrock after it is installed so that the sheetrock can be painted.  Taping is also referred to as drywall finishing.  (*Id.* at ¶ 18.)

prior to or after the Jardim Project, neither worked with PZ in any capacity. (*Id.*) PZ and Atlantic have never shared or employed the same employees. (*Id.* at ¶ 30.) The Jardim Project was the only contract between the two entities.  (*Id.* at ¶ 24.)

The PZ-Atlantic Contract was negotiated through an arms-length transaction between Roberto Mantese head of PZ's procurement office, and Mr. Acevedo, owner of Atlantic, and it was a labor services contract that required PZ to pay Atlantic $30.00 an hour for all labor it supplied and to supply materials.  (Id. at ¶¶ 19-20.) This type of contract is called a "time and material contract" and is common in the construction industry.  (Id. at ¶ 20.)  The PZ-Atlantic contract established that all work performed by Atlantic would be done as an independent contractor. (Id. at ¶ 22.) No Plaintiff was part of the negotiation between PZ and Atlantic and none deposed have seen the contract.  (Id. at ¶ 32.)

## III.    RELEVANT FACTS TO JOINT EMPLOYMENT STATUS

### A.    Recruiting, Hiring, Firing and Setting of Plaintiffs' Method of Pay and Rates

Atlantic was responsible for hiring its own workers, and the foremen who supervised those workers on a day-to-day basis at the worksite. (*Id.* at ¶¶ 47, 58, 59.) Plaintiffs testified that they learned that Atlantic was hiring through co-workers, friends or other sources, but none of them learned about the work through PZ. (*Id.* at ¶¶ 34-35.) These Plaintiffs met with an Atlantic foremen when they first arrived at the Jardim Project. (*Id.* at ¶ 35.) For example, Hector Miranda, a worker Atlantic assigned to be a foreman had known Mr. Acevedo and Mr. Gonzalez, the owners of Atlantic, prior to the Jardim Project, and it was Mr. Gonzalez who contacted Mr. Miranda to offer him work there. (*Id.* at ¶¶ 36-41.) Prior to working on the Jardim Project, Mr. Miranda had never worked with PZ before and did not know any PZ employees. (*Id.* at ¶ 37.) If Mr. Miranda needed more workers on the Jardim Project, he contacted Mr. Acevedo to send more workers. (*Id.* at ¶ 47.)

6

When Atlantic employees first arrived at the worksite looking for work from Atlantic, an Atlantic foreman would ask about their work experience level, and sometimes, an Atlantic foreman would have potential employees demonstrate their skill level. (*Id.* at ¶ 45.) For example, taping work is classified from Level 1 to Level 5 with Level 5 being the most difficult type of work and the Jardim Project required Level 5 tapers. (*Id.* at ¶ 46.) Atlantic foreman determined, in their own discretion and without input from PZ, whether a potential employees was suitable and should be hired. (*Id.* at ¶¶ 42, 45, 63, 108.)  Further, tapers hired to work on the Jardim Project came to the work site with all the tools an experienced taper would need to perform work, including work boots, hard hats, stilts, numerous spatulas, also referred to as "knives," and a tool box. (*Id.* at ¶ 107.)

PZ had no role in setting Atlantic employee pay rates including Atlantic foremen. (*Id.* at ¶¶ 108-117.) Employees were told what the pay rate would be by the Atlantic foreman they met with at the time they were hired. (*Id.* at ¶ 42.) When some plaintiffs were first interviewed by an Atlantic foreman on the Jardim Project, they tried to negotiate higher hourly rates with them based on their experience or other factors. (*Id.* at ¶ 43.)

PZ had no role in paying any Atlantic foreman or laborer after they were hired by Atlantic including distributing their pay checks. (*Id.* at ¶ 118.) On a weekly basis, Mr. Acevedo or Mr. Gonzalez would come to the worksite and pay Atlantic workers by handing out envelopes to them; or sometimes Atlantic foremen distributed the envelopes. (*Id.* at ¶ 128.) Atlantic either issued company checks and/or paid cash to its employees, and no Atlantic employee ever received a check or cash from PZ. (*Id.* at ¶¶ 129, 130.) At no time did any PZ employee tell or otherwise speak with any Atlantic employees including Atlantic foremen about what they would be paid while working. (*Id.* at ¶ 131.) If a specific Atlantic worker had an issue about pay, such as missing hours, the

worker would speak to Mr. Acevedo, Mr. Gonzalez or an Atlantic foremen to resolve it, and indeed, some workers did receive additional pay after complaining. (*Id.* at ¶¶ 132, 133.) PZ was not involved with these pay issues between Atlantic and its employees. (*Id.* at ¶ 134, 135.)

PZ was also never involved with the decision to give Atlantic workers pay raises. (*Id.* at ¶ 110, 111.) Atlantic foremen told Atlantic workers that if they did well, they would get pay increases. (*Id.*) Some Atlantic workers, including Plaintiffs requested and received pay raises during their employment from different Atlantic foremen. (*Id.* at ¶ 111.) For example, when Mr. Andy Gil, a named plaintiff, was promoted to foreman, Mr. Munoz (another Atlantic foreman) told him he would receive a pay raise. (*Id.* at ¶ 115.) It was Atlantic's sole decision, without any input from PZ, to determine if employees would receive requested pay increases.  To the contrary, Atlantic foremen provided input to Joel Acevedo about an employee's work performance to determine whether the worker should get a pay increase. (*Id.* at ¶ 116.) Atlantic workers also testified Mr. Acevedo determined whether employees would receive pay increases. (*Id.* at ¶ 117.)

## B.       The Day-to-Day Supervision and Evaluation of Atlantic Employees

Atlantic foremen told newly hired employees their work schedule and where the employees would be placed to work in a given day. (*Id.* at ¶ 62.) Thereafter, Atlantic foremen would check completed work and answer questions as needed. (*Id.* at ¶¶ 57, 59, 65.)

During the Jardim Project, Atlantic foremen would inform Atlantic employees their hours and days of work including additional hours they may be needed. (*Id.* at ¶ 95.) Atlantic employees worked various different shifts, with some workers arriving or leaving at different times than others. (*Id.* at ¶ 64.) PZ had no input over which employees worked a particular shift. (*Id.* at ¶ 64, 97, 98.) When additional Atlantic staffing was necessary to keep the Jardim Project running on schedule, PZ could not, and did not, require specific Atlantic workers to work on those occasions;

Atlantic foremen would determine who needed to work late and Atlantic workers stayed to work additional hours if they chose. (*Id.*)

Experienced tapers like those working on the Jardim Project generally did not need help from foremen or anyone else to perform their taping work. (*Id.* at ¶ 70.) However, if a taper needed anything to perform his job, he would contact a foreman. (*Id.*) As Plaintiffs clearly testified, the job of a "foreman" (also referred to as a "supervisor") was to direct and supervise the workers on a day-to-day basis including but not limited to giving them daily instructions and making sure their jobs were done correctly. (*Id.* at ¶ 59.) Foremen did not usually perform the substantive carpentry or taping work but rather served in a traditional "supervisor" capacity by providing direct day-to-day supervision of employees, attending construction meetings with PZ to coordinate work, and would make a plan the day before to see what was finished and what needed to be done the next day. (*Id.* at ¶¶ 60, 61, 65, 80.) For example, after Mr. Gil was assigned by Atlantic foremen to be a foreman of the tapers, he received taping related questions from other tapers and he was always able to answer those questions. (*Id.* at ¶ 71.) Atlantic foremen were also responsible to report to the Atlantic owners about the progress of the work on the Jardim Project through phone calls and text messages and check on the work when completed. (*Id.* at ¶ 66.)

PZ was responsible for making sure that the work completed by subcontractors, including Atlantic workers, complied with the overall plans for the Jardim Project. (Id. at ¶ 78.) If a subcontractor made some type of error in their work, the rest of the Jardim Project could be affected. (Id. at ¶ 79.) If Atlantic employees' work was not done according to the building plans, a PZ employee would speak to an Atlantic foreman to correct it. (*Id.* at ¶¶ 83-84.) For larger quality problems, PZ contacted Mr. Joel Acevedo and sometimes scheduled a walkthrough of the jobsite.

(*Id.* at ¶ 85.) If PZ had any issues with the Atlantic foremen, PZ employees would bring their concerns to Mr. Acevedo. (*Id.* at ¶ 86.)

Upon arriving at the worksite each day, Atlantic employees were directed by their foremen to sign in and out using a sign-in sheet created by Mr. Orlando Munoz, an Atlantic foreman. (*Id.* at ¶¶ 89, 136.) Atlantic would use these time-sheets to prepare invoices to send to PZ for payment. (*Id.*) The sign-in sheets were generally at the entrance/exit of the Jardim Project during the day, and Atlantic foremen were responsible for making sure the sign-in sheets were where they needed to be and verifying that Atlantic workers were at their work stations. (*Id.* at ¶ 90.)

The owners of Atlantic, Mr. Acevedo and Mr. Gonzalez, would come to the Jardim Project site several times per month. (*Id.* at ¶ 56.) When the owners of Atlantic were not onsite, foremen including "Norman;" Mr. Munoz; Moyo Acevedo; Mr. Miranda; and Mr. Gil, were designated by Atlantic to supervise and evaluate all of its employees. (*Id.* at ¶ 57.) At no time did PZ employ a foreman or other supervisor to oversee Atlantic carpenters, tapers or other laborers who worked on the Jardim Project or any other subcontractor employees for that matter. (*Id.* at ¶ 58.)

No PZ employee had the authority to fire an Atlantic employee. (*Id.* at ¶¶ 33, 52, 53.) However, there were limited occasions, consistent with general contractor responsibilities for the entire Jardim Project, where PZ requested that certain workers be removed from the job site if the workers behavior was affecting the entire project, affecting safety, or not performing under the PZ-Atlantic Contract in a way that might jeopardize the construction schedule. For example, on one occasion, PZ employees discovered several Atlantic employees playing music loudly on the job site and dancing. (*Id.* at ¶ 49.) Because it was obvious these employees were not working and also presented a safety concern, Mr. Maddedu asked Mr. Miranda to remove these employees from the job site. (*Id.*) On another occasion, Mr. Maddedu met with Mr. Acevedo to suggest that Mr.

Leonel "Moyo" Acevedo, a foreman who failed to coordinate Atlantic workers to complete their work on time and who was drunk while at work on the Jardim site, be replaced a different foremen. (*Id.* at ¶ 51.)

### C.     PZ Responsibilities to Ensure Proper Billing

Under the terms of the "time and material" contract, PZ agreed to pay Atlantic a set hourly rate for all labor provided at the Jardim Project. (*Id.* at ¶ 20.) To ensure that Atlantic submitted accurate invoices, necessary documentation regarding labor hours needed to be submitted to and reviewed by PZ to determine if there were any discrepancies in billing. (*Id.* at ¶¶ 92, 94, 124.)

Atlantic submitted invoices supported by "timesheets" it created showing the total hours each employee worked. (*Id.* at ¶ 122.) When PZ reviewed Atlantic invoices, it would also review the sign-in sheets to ensure they accurately captured the total number of labor hours they reflected. (*Id.* at ¶ 123.) Mr. Di'Nola worked with Mr. Miranda to verify the hours for Atlantic's invoices. (*Id.* at ¶ 124.) If Atlantic needed to redo work or took so long to complete work that it disrupted PZ's schedule for other subcontractors and caused delay in other work on the Jardim Project, PZ deducted the fees for the delayed subcontractors from the payment for Atlantic's invoices. (*Id.* at ¶ 125.) Sometimes, delays from other contractors would balance out these backcharges. (*Id.*) However, at no time did PZ ever direct or otherwise suggest that backcharges amounts be deducted from an Atlantic employee's pay. (*Id.*) If there was any disagreement about the amount of labor hours Atlantic provided, PZ employees would speak with Atlantic management about these issues and they would work out any differences directly, or Mr. Di'Nola would speak to Atlantic foreman Hector Miranda who consulted Mr. Acevedo and reported back. (*Id.* at ¶ 126.)

### D.     Employment Records and Other Indicia of Employment Status

PZ did not maintain any personnel files or other employment files for Atlantic employees. (*Id.* at ¶ 140.) The sign in sheets Atlantic workers used were created and kept by Atlantic foremen.

(*Id.* at ¶ 136.) While Mr. Di'Nola might have made copies of the sign-in sheets so that he could use them to tally up hours to verify the invoices PZ received from Atlantic, he did not maintain the originals of the sign-in sheets. (*Id.* at ¶¶ 94, 137.) Atlantic also appears to have other employment records that it maintained for its employees working on the Jardim Project. (*Id.* at ¶ 137.) For example, when Mr. Gil needed documentation about his employment status for Medicaid, he asked Mr. Miranda. (*Id.* at ¶ 138.) Mr. Acevedo then provided Mr. Gil with a letter on Atlantic letterhead confirming his employment with Atlantic. (*Id.*) Other Atlantic employees appear to have requested similar letters from Atlantic confirming their employment. (*Id.* at ¶ 139.)

The PZ-Atlantic Contract required Atlantic to provide an applicable level of insurance prior to working on the Jardim Project including but not limited to workers' compensation insurance. (*Id.* at ¶ 23.) At no time did PZ provide any wages or any other benefits to Atlantic employees. (*Id.* at ¶ 127.) When Rafael Hernandez, an Atlantic employee, was injured while working on the Jardim Project, he filed for workers' compensation benefits under Atlantic's workers' compensation plan. (*Id.* at ¶ 103.)  Mr. Hernandez also spoke with Mr. Acevedo about his injuries and was told by Mr. Acevedo that Atlantic would pay for his hospital bills. (*Id.* at ¶ 106.)

## THE LEGAL STANDARD

Summary judgment should be granted where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage of the litigation, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Martin v. Sprint United Management Co.*, 273 F.Supp.3d 404, 420 (S.D.N.Y. 2017) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008)). Despite the fact-

intensive nature of the joint employer analysis discussed below, courts grant summary judgment in FLSA and NYLL cases where a party demonstrates the economic realities of its relationship with a subcontractor reveal the party did not exert the requisite level of control over the subcontractor, including in a construction industry context. *Martin*, 273 F.Supp.3d at 434;  *Thomas v. River Greene Constr. Grp., LLC*, No. 17 Civ. 6954 (PAE); 2018 WL 6528493, at *9 (S.D.N.Y. Dec. 11, 2018); *Matter of Ovadia v. Office of Indus, Bd of Appeals*, 19 N.Y.3d 138, 145 (2012).

The FLSA and NYLL require Plaintiffs to satisfy a four-factor test ("the *Carter* factors") to survive summary judgment on the issue of whether PZ Defendants were their joint employers. They must show PZ Defendants (1) had the power to hire and fire Plaintiffs, (2) supervised and controlled Plaintiffs' work schedules or conditions of employment, (3) determined Plaintiffs' rate and method of pay, and (4) maintained Plaintiffs' employment records. *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984) (quoting *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1470 (9 Cir.1983)).   In a revised U.S. Department of Labor ("USDOL") joint employer rule published earlier this year, the department made clear that the second factor provides for supervision and control "to a substantial degree." 29 C.F.R. § 791.2. [5]

In addressing the issue of joint employment in the construction industry, courts have observed that:

> "As a practical matter, general contractors in the construction industry do not hire or supervise the workers employed by their subcontractors; they do not usually maintain the employment records for each worker or track the individual workers' schedules or rates of pay. The primary objective of a general contractor is to keep the project on schedule and to coordinate the work among subcontractors in order to avoid costly delays in the completion of the project. Thus, general contractors frequently interact with the principals and supervisors of the subcontractors and

---

[5] The USDOL has specifically noted that this rule was reissued to provide more certainty for parties "particularly in those situations where an employee performs work for an employer and that work simultaneously benefits another individual or entity (for example, where the employer is a subcontractor, and the other entity is a general contractor)." "Joint Employer Final Rule Frequently Asked Questions" No. 4 available at https://www.dol.gov/agencies/whd/flsa/2020-joint-employment/faq#4 (last visited July 16, 2020).

generally have no direct control or functional supervision over the employees performing work for the subcontractors."

*Ovadia,* 19 N.Y.3d at 143. Because there is no material difference in the scenario described by the *Ovadia* court and the relationship here between Atlantic and the PZ Defendants, Plaintiffs cannot satisfy the *Carter* factors to establish joint employment.

## ARGUMENT

### I.  The PZ Defendants Were Not The Employers Of The Atlantic Workers.

An entity is an "employer" under the FLSA where it "suffer[s] or permit[s] an individual to work." 29 U.S.C. § 203(g). While the provisions of NYLL define "employer" slightly differently, courts in this district interpret the NYLL definition "coextensively with the definition used by the FLSA" *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) (quoting *Jiao v. Shi Ya Chen*, No. 03 Civ. 165 (DF), 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007)); *Hart v. Rick's Cabaret Intl., Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013) ("The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA").

Under the FLSA and NYLL, Second Circuit courts determine the economic reality of an employment relationship by considering the *Carter* factors described above. *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008) (quoting *Carter*, 735 F.2d at 12 (additional quotations omitted)). Courts consider "the totality of the circumstances" but are most concerned with the level of control an alleged employer exerts over the employees of another entity. *Barfield*, 537 F.3d at 142-43. Further, as the USDOL has also reiterated in a final rule published on March 16, 2020, courts should consider whether an employer *actually carried out* the actions in the above test, not merely whether an entity had the ability to do so. 29 C.F.R. § 791.2 (emphasis added).

PZ was not the employer of the Atlantic workers under the *Carter* test because its control over the Atlantic workers failed to extend beyond that of a traditional contractor/subcontractor relationship, which has held to be legally insufficient to establish joint employment.

### A.      PZ Did Not Recruit, Hire, Fire or Set Atlantic Employees Rate of Pay.

The first and third *Carter* factors strongly weigh in favor that PZ is not a joint employer and they are addressed together for simplicity.

First, courts have found that an alleged employer did not have authority to hire plaintiffs where the alleged employer played no role in the hiring process. *Jean-Louis v. Metro. Cable Commc'ns, Inc.,* 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) For example, in *Jean-Louis*, the court held that the first *Carter* factor weighed in favor of Time Warner where the company that contracted with it for installation services interviewed and reviewed candidates before hiring them and that no employees met or communicated with Time Warner prior to being hired by the contractor. *Id.*

Similarly, on the Jardim Project, Atlantic workers testified that they heard about work through word of mouth, through the owners of Atlantic, or through foremen of Atlantic. (Def. 56.1 at ¶ 34.) In fact, no Atlantic foreman or employee had any pre-existing relationship with PZ prior to the Jardim Project. (*Id.* at ¶¶ 31, 37.) Rather, Plaintiffs testified that when they arrived at the Jardim Project, they met with an Atlantic foreman who told them about the pay rate, spoke with them about their experience, and sometimes even required them to demonstrate their skill as work on the Jardim Project required very experienced tapers. (*Id.* at ¶ 45.) While Plaintiffs may claim that some Atlantic workers were introduced to PZ upon being hired, no plaintiff has testified that Atlantic workers had to meet with PZ as a condition of hiring, that PZ approval was needed for any hire (or that PZ even knew any of these employees), or that PZ employees contacted Atlantic workers to recruit them. (*Id.* at ¶ 63.) The mere fact that some Atlantic employees may have met

with PZ employees when they came to the worksite makes practical sense and falls wholly short of establishing the power to hire. Further, even if it had such authority, the record offers no evidence that PZ actually exercised any hiring authority as required by USDOL's final rule. 29 C.F.R. § 791.2.

Second, PZ had no role in setting Atlantic workers' pay rates or actually paying them. (*Id.* at ¶¶ 33, 42, 108, 110, 118, 129, 130.) During the employees initial meetings, the foreman would tell potential employees the pay rate and some tried to negotiate higher starting rates based on their experience. (*Id.* at ¶ 43.) There is no evidence in the record that PZ employee even knew how much Atlantic foremen or Atlantic employees were being paid at the start of their employment or during it. (*Id.* at ¶¶ 108, 131.)

It is also undisputed that not only did Atlantic pay its employees with Atlantic checks or cash, but it was entirely Atlantic's decision to give its employees pay increases. (*Id.* at ¶¶ 110, 116, 117, 128, 129.) Atlantic workers requested and/or received pay raises during their employment from different Atlantic foremen, and Plaintiffs testified that foremen requested Mr. Joel Acevedo's approval to provide workers with a pay raise. (*Id.* at ¶¶ 112-17.) There is no evidence PZ had any involvement with Atlantic workers' pay increases. (*Id.* at ¶ 110.) Notably, the PZ-Atlantic Contract was never amended or otherwise affected whatsoever by any pay increase given by Atlantic to its employees. (*Id.* at ¶¶ 112-17.) Furthermore, Plaintiffs testified that complaints about pay including missing hours were addressed with Mr. Acevedo, Mr. Gonzalez, or an Atlantic foreman and Mr. Acevedo would sometimes make adjustments based on these complaints. (*Id.* at ¶¶ 132-35.) Accordingly, these undisputed facts cut against joint employment status. *See Hugee v. SJC Grp., Inc.*, No. 13 Civ. 0423 (GBD), 2013 WL 4399226, at *7 (S.D.N.Y. Aug. 14, 2013) (granting motion to dismiss complaint where third *Carter* factor weighed in favor contractor because

subcontractor employee conceded the subcontractor informed him of his rate of pay and issued his paychecks).

Third, with regard to the "firing" test, neither Mr. Di'Nola nor Mr. Campoccia had authority to terminate these employees from Atlantic (as they could have placed at any other worksite) but as the general contractor, they could request such employees be removed from the worksite for violating contractual requirements including performing their work in a safe manner or causing delays in schedule with incorrect work. (Def. 56.1 at ¶¶ 49-53.) However, ensuring compliance with safety rules and keeping a project on schedule and on-budget is the responsibility of the general contractor and is part and parcel of the traditional general contractor – subcontractor relationship in construction management. (*Id.* at ¶ 6.) The PZ Defendants concede there were limited circumstances when it was necessary, in order to comply with their general contractor obligations, to request certain subcontractors' employees to be removed from the worksite for violations of serious safety rules such as coming to the worksite clearly inebriated. (*Id.* at ¶¶ 49-53.) However, the mere fact that an alleged joint employer might bar a subcontractor's worker from performing services for the alleged employer does not mean that the subcontractor worker is fired from the subcontractor. In *Jean-Louis*, the court held that even though Time Warner could "de-authorize" an installation technician from doing installation work while employed by the subcontractor, this was not the same as a decision to prevent the technician from working for the subcontractor altogether or from working for Time Warner in another capacity. *Id.* at 124; *see also Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014) (granting summary judgment where agency had power to remove home attendant from a patient's case, not fire them altogether).

Here, while PZ did request that Atlantic remove workers from the job site on a handful of occasions, there is no evidence that these individuals were fired from Atlantic altogether. In fact, one of the Atlantic foreman that PZ determined was not complying with contractual obligations was Moyo Acevedo, who appears to be the brother of Joel Acevedo, the owner of Atlantic. (Def. 56.1 at ¶ 51.) Although no deponent had personal knowledge of this possibility, common sense would suggest that Moyo Acevedo found other work at his brother's company. Further, courts have rejected joint employment status against general contractors in situations where on isolated occasions the general contractor asked subcontractor employees to be removed from the job site. *See Quintanilla v. A & R Demolitina, Inc.*, No. CIV.A. H-04-1965, 2005 WL 2095104, at *10 (S.D. Tex. Aug. 30, 2005) (finding lack of joint employer relationship even where general contractor asked to remove a subcontractor's superintendent from the project).

Lastly, it would be inconsistent with the traditional general contractor – subcontractor relationship in construction, common sense, and sound public policy to penalize a general contractor by expanding its potential liability when it seeks to remove individuals from a worksite who violate safety and health rules such as showing up inebriated or failing to live up to contractual obligations and work quality standards. This is precisely why the USDOL stated in relevant part in the preamble to the final rule on joint employment:

> "These updates are intended to assist organizations that may be hesitant to enter into beneficial relationships or engage in worker-friendly business practices for fear of being held liable for the wages of employees over whom they have insignificant control."

Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. 2820-01 at 2823-34, January 16, 2020.

**B.     PZ Did Not Control The Work Schedules or Terms & Conditions of Atlantic Workers' Employment**

The second *Carter* factor also weights in favor of PZ because, put simply, PZ did not supervise or control Atlantic workers' work schedules or their conditions of employment in any way inconsistent with its general contractor status.

While PZ Defendants, as discussed above, monitored the quality of Atlantic's work (and that of other subcontractors on the Jardim Project), courts recognize that merely exercising oversight to ensure compliance with safety and security regulations, or to ensure that subcontractor's work was carried out for quality assurance purposes, does not indicate joint employment. *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 75 (2d Cir. 2003) (noting that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement")(quoting *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) (holding in Family and Medical Leave Act case that indirect supervision or control to ensure compliance with various safety and security regulations was not indicative of control of terms and conditions of employment required for joint employer status). It defies common sense to suggest that a general contractor with overall responsibility for a construction project that enters into service agreements with subcontractors for work on the project could not oversee that work to ensure it was getting the services it contracted for without compromising the independent contractor relationship with its subcontractors. This is particularly true in construction where work among subcontractors must be coordinated because poor quality work will prevent other subcontractors from doing their work and jeopardize safety and scheduling on the entire project.

The fact that PZ employed Mr. Paraison, who was responsible for safety on the Jardim Project, and who could stop any worker – Atlantic or otherwise – if safety was at risk, does not

suggest control indicative of a joint employer relationship. (Def. 56.1 at ¶ 10(d).) In *Quintanilla*, the court found two general contractors did not exert control over a subcontractor's employees despite that a general contractor's superintendent had the right to correct safety violations. 2005 WL 2095104, at *9; *see also* 29 C.F.R. § 791.2(d)(4)("The potential joint employer's contractual agreements with the employer requiring quality control standards to ensure the consistent quality of the work product, brand, or business reputation do not make joint employer status more or less likely….Similarly, the monitoring and enforcement of such agreements…does not make joint employer status more or less likely….") Hence, Mr. Paraison's work to ensure safety standards were met on the Jardim Project was further quality control that did not transform PZ into Atlantic's employer under applicable law. Strong public policy considerations favor permitting general contractors to appropriate monitor and address the safe work habits of subcontractors without expanding potential joint employment liability. To hold otherwise would discourage general contractors for taking an active role in safety matters.

PZ also does not dispute that Mr. Di'Nola, as part of his duties, interacted with frequently with Mr. Acevedo, and Atlantic foremen, like Mr. Miranda, to coordinate scheduling and work of subcontractors including Atlantic. This is standard operating procedure for a general contractor on a construction project, *i.e.,* work directly with the subcontractor's foremen/supervisors (as opposed to non-supervisory employees) who are assigned by the subcontractor to supervise and evaluate the day-to-day work of its own employees. Indeed, courts acknowledge that a general contractor must do this to "keep the project on schedule and to coordinate the work among subcontractors in order to avoid costly delays." *Ovadia*, 19 N.Y.3d at 143. Moreover, in *Martin*, the court dismissed plaintiffs' arguments that Sprint attended subcontractor meetings and had power to pull agents from certain areas in the event of overproduction, noting that "the formal control factor requires

greater involvement on the putative joint employer's part." 273 F. Supp. 3d at 425. Indeed, only the construction manager is able to coordinate all the work of the many subcontractors on site to ensure that the work is done timely and in the proper sequence and safely. If a general contractor was not able to direct what work needed to be done and when, no construction project would ever be completed.  For example, until the taping work is complete, the painting subcontractor cannot start. But it defies logic to suggest that a general contractor would open itself up to joint employment liability merely by telling taping subcontractors that for the next two days, certain floors need to be taped before others in order to make sure the a project proceeds on schedule.  In other words, the traditional function of a general contractor is to coordinate and ensure work is done within contractual specifications and this inherently requires some degree of direction to subcontractors and hardly supports joint employment status. *See Zheng,* 355 F.3d at 74-75; *Ovadia*, 19 N.Y.3d at *144-45 ("Inasmuch as a general contractor is expected to conduct routine quality control inspections and ensure that the coordination and sequencing of the work proceeds on schedule, this fact does not render the general contractor an employer of all workers at the job site.").

Additionally, the record firmly establishes that Atlantic foremen did all of the day-to-day substantive work supervision and evaluation of Atlantic employees. (Def. 56.1 at ¶ 57.) In fact, as Plaintiffs testified, the primary duty of a foreman/supervisor is to oversee the daily work of the employees and to check the work when complete (as opposed to doing the work). (*Id.* at ¶¶ 57, 59, 61, 65.) Furthermore, neither Mr. Di'Nola (hired immediately after completing college), nor Mr. Campoccia, nor Mr. Maddedu had specific carpentry, drywalling, or taping experience. (*Id.* at ¶¶ 10(c), 76.) On that level alone, they did not have the skill set to substantively evaluate, direct or control the work of experienced tapers, some of which had decades of experience in this trade.

Further evidence of this fact is that before Mr. Gil was promoted to foreman, his conversations with Mr. Di'Nola were limited to non-work-related pleasantries such as good morning. (*Id.* at ¶ 73.) As a foreman, Mr. Gil never spoke to any PZ employee about substantive taping work and he acknowledged no PZ employee onsite had taping experience. (*Id.* at ¶ 75-77.) In addition, neither Mr. Campoccia nor Mr. Maddedu spoke Spanish, the main language of many of the Atlantic workers so on a practical level any conversation with Atlantic employees would be limited by this fact. (*Id.* at ¶¶ 10(a), 10(c).)

Further, courts hold that an alleged joint employer is not controlling the schedules of subcontractor employees even where the plaintiff employee filled out time sheets at the request of the alleged employer, and where the general parameters of the timing during which the plaintiffs should complete work was dictated by the alleged joint employer. *See Jean-Louis*, 838 F.Supp.2d at 125-26; *Hugee*, 2013 WL 4399226, at *5. For example, in *Hugee*, the plaintiff, a security guard employed by a subcontractor of NESCTC Security Agency, LLC ("NESCTC") was required to report to NESCTC's operators about his arrival to and departure from his worksite, and to fill out NESCTC's timesheets. 2013 WL 4399226, at *5. The court dismissed NESCTC from the action and found that this type of timekeeping was "insufficient to demonstrate supervision or control over Plaintiff's work schedules or conditions of employment." *Id.*

Likewise, though the PZ-Atlantic Contract dictated the timing during which work should be completed, and sometimes communicated to Atlantic that additional hours would be needed to complete certain work by a deadline, Atlantic workers left at different times throughout the day and no PZ employee decided which Atlantic worker left at a certain time or on a specific day. (Def. 56.1 at ¶¶ 64, 97,98.)  Additionally, in contrast to *Hugee*, Atlantic workers were instructed to sign in and out by *Atlantic foremen* and using a form *Atlantic* created. (*Id.* at ¶¶ 89-91, 136.) To the

extent that PZ ultimately used the sign-in sheets to verify the aggregate hours worked, this practice does not signify "control" of Atlantic worker schedules but was only done to ensure accurate billing since the PZ-Atlantic contract was a "time and material" agreement where Atlantic charged PZ a set hourly rate for all aggregate labor provided by Atlantic. (*Id.* at ¶¶ 92, 94.) In addition, that PZ may have told Atlantic foremen that they needed more laborers on a given day because work progress was beyond schedule hardly supports joint employment status. It was up to Atlantic to speak with employees to ensure that the project had proper staffing. (Def. 56.1 at ¶ 47.)

**C.    PZ Did Not Maintain Atlantic Workers' Employment Records.**

Finally, the fourth *Carter* factor clearly weighs against joint employer status in this case. PZ maintained no records of Plaintiffs, employment-related or otherwise, other than the sign-in sheets PZ used to ensure accurate billing via the PZ-Atlantic time and material contract, discussed above. (*Id.* at ¶¶ 92, 94, 140.) Courts find this factor does not weigh in favor of joint employment where the records at issue were kept only to ensure compliance with the contract. *See Hugee,* 2013 WL 4399226, at *7-8; *Jacobson*, 740 F. Supp. 2d at 692. In *Hugee*, the court granted a motion to dismiss and held that this factor did not indicate joint employment of a security guard because, though the guard claimed that NESCTC required him to "fill out timesheets," he failed to allege that the entity kept these records for anything other than quality control purposes. 2013 WL 4399226, at *7. The *Jacobson* court also rejected the notion that maintaining arrival and departure data indicated joint employer status where the information used in the records was used to ensure "Comcast receives the services for which it is entitled, and that the individuals fulfilling them are authorized to do so" and the plaintiffs presented no evidence that the information was used "to control a technician's day to day employment, or that Comcast retains records for any purpose beyond quality control." *Id.* at 692. Similarly, PZ retained copies of the "sign-in sheets" which Atlantic created and required its employees to complete when starting or ending a shift for the

business purposes of ensuring accurate invoicing under the PZ-Atlantic time and material contract which set forth an agreed-upon hourly labor rate.

> **D.     Mr. Di'Nola and Mr. Campoccia Were Not The Employers of the Atlantic Workers.**

As joint employer liability to PZ runs through the conduct of its employees, for the same reasons discussed above, Mr. Di'Nola and Mr. Compoccia are not employers to the Plaintiffs. Courts use the *Carter* factors to consider where an individual employee may be considered an employer. *Thomas*, 2018 WL 6528493, at 6-8.

First, the record is clear that Mr. Campoccia was an upper managerial employee of PZ that primarily served as the liaison between PZ and WC, the owner of the Jardim Project. (Def. 56.1 at ¶ 10(a).) Mr. Campoccia had no ownership interest in PZ. (*Id.*) Additionally, there is no suggestion that he hired or fired any plaintiff, or that he was involved in setting their pay rate or paying them directly. There is also barely any evidence of him speaking with Plaintiffs, let alone controlling their work schedules or terms or conditions of employment.

Next, while Mr. Di'Nola interacted with Atlantic foremen more frequently as they were Atlantic's liaisons to the general contractor, he does not meet the *Carter* factors. Mr. Di'Nola also had no ownership interest in PZ and testified that working for PZ was his first employment out of university. (Def. 56.1 at ¶ 10(c).) He described his role on the Jardim Project as handling overall tasks on the Jardim Project, such as ordering materials, creating a timeline of construction tasks to be completed, making sure construction was completed according to plans, and handling invoices for subcontractors on the Jardim Project. (*Id.*) He further described himself as "personal assistant" to Mr. Maddedu. (*Id.*) The fact that he had no carpentry and/or taping experience, the work Atlantic employees performed, undermines any suggestion he was involved in the day-to-day supervision or evaluation of Plaintiffs. (*Id.* at 76, 77.)

24

## CONCLUSION

For the reasons set forth above, PZ Defendants respectfully request that this Court grant their motion for summary judgment dismissing the Plaintiffs' claims against the PZ Defendants in their entirety, and such other relief as the Court deems just and proper.

Dated:  New York, New York
       July 16, 2020

                                 Respectfully submitted,

                                 COZEN O'CONNOR

                                 By: ___s/John Ho_____
                                 John Ho
                                 Jennifer A. Queliz
                                 277 Park Avenue
                                 New York, New York 10172
                                 (212) 883-4927
                                 jho@cozen.com;
                                 jqueliz@cozen.com

                                 *Attorneys for Defendants*
                                 *Pizzarotti LLC, Ignazio Campoccia,*
                                 *and Giacomo Di'Nola*