USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/29/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDY GIL and RAFAEL HERNANDEZ, on behalf of themselves and all other similarly situated,

Plaintiffs,

-against-

PIZZAROTTI, LLC., ATLANTIC CONTRACTING OF YONKERS, INC., JOEL ACEVEDO, IGNAZIO CAMPOCCIA, GIACOMO DI'NOLA a/k/a GIACOMO DI NOLA, JOHN DOE CORPORATIONS 1-10, and RICHARD ROES 1-10,

Defendants,

---

1:19-cv-03497-MKV

OPINION AND ORDER
DENYING MOTION FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Andy Gil and Rafael Hernandez, now joined by over thirty opt-in plaintiffs (collectively, "Plaintiffs"), brought this putative class or collective action asserting claims for unpaid overtime wages under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). Plaintiffs have sued Atlantic Contracting of Yonkers, Inc. ("Atlantic"), its co-owner Joel Acevedo, and three other defendants: Pizzarotti LLC ("PZ"), Giacomo Di'Nola, and Ignazio Campoccia (collectively, the "PZ Defendants"). Plaintiffs are former employees of Atlantic, which was retained by PZ as a subcontractor in connection with a construction project for which PZ served as the general contractor. The PZ Defendants moved for summary judgment on the ground that they were not Plaintiffs' "employers" under the FLSA and NYLL and therefore cannot be liable for unpaid overtime compensation. For the reasons discussed below, the PZ Defendants' motion is DENIED.

## BACKGROUND

### A. Factual Background[1]

PZ is a global construction company that provides construction management services. (Pls.' Resp. Defs.' 56.1 Statement ("Pls.' 56.1") ¶ 1 [ECF No. 101].)  PZ was hired to serve as the construction manager, or general contractor, for a large building project in Manhattan (the "Jardim Project").  (Pls.' 56.1 ¶ 4.)  In this role, PZ was required to coordinate and manage various subcontractors and oversee day-to-day operations to ensure timely completion of the Jardim Project, at or under budget, to the owner's expected standard of quality.  (Pls.' 56.1 ¶¶ 6, 9.)

As construction manager, PZ was not responsible for having its own employees perform construction work.  (Pls.' 56.1 ¶ 7.)  Defendant Ignazio Campoccia, PZ's Project Executive, was responsible for supervising all operations and communicating with the property owner.  (Pls.' 56.1 ¶ 10.a.i.)  Roberto Maddedu, PZ's Senior Project Manager, was responsible for managing PZ personnel, confirming that the Jardim Project was developed as planned, and ensuring that subcontractors executed their work in accordance with their respective contracts.  (Pls.' 56.1 ¶ 10.b.)  If the project owner was not satisfied with portions of the construction project, Maddedu and Campoccia would address the issue with the subcontractor's owner, foremen, or both.  (Pls.' 56.1 ¶ 10.b.i.)  Defendant Giacomo Di'Nola, PZ's Project Engineer, was responsible for the overall

---

[1] The following facts are undisputed unless otherwise noted. The Court generally cites to Plaintiffs' 56.1 Response Statement because it contains both the PZ Defendants' assertions and Plaintiffs' responses. The PZ Defendants ask the Court to strike or deem as admissions various responses in Plaintiffs' 56.1 Response Statement. (*See generally* Defs.' Reply Pls.' 56.1 Statement [ECF No. 105].) The Court "does not blindly accept [the parties'] 56.1 Statement[s] at face value, as allegations are not deemed true simply by virtue of their assertion in the Local Rule 56.1 statement." *RP Family, Inc. v. Commonwealth Land Title Ins. Co.*, No. 10–CV–1149 (DLI)(CLP), 2014 WL 1330932, at *1 (E.D.N.Y. Apr. 1, 2014) (quoting *Suares v. Cityscape Tours, Inc.*, No. 11 Civ. 5650(AJN), 2014 WL 969661, at *2 (S.D.N.Y. Mar. 12, 2014)). The Court has carefully reviewed the parties' 56.1 Statements and has independently assessed the underlying record to determine whether material factual disputes exist and summary judgment is appropriate. *See Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995))).

day-to-day tasks on the Jardim Project, including ordering materials, scheduling completion of construction tasks, ensuring construction was completed according to plan, and handling invoices for subcontractors.  (Pls.' 56.1 ¶ 10.c.)

In connection with the Jardim Project, PZ entered into agreements with subcontractors for various forms of construction work.  (Pls.' 56.1 ¶ 11.)  PZ contracted with Atlantic for carpentry, drywall, and taping (*i.e.*, preparing sheetrock to be painted) services.  (Pls.' 56.1 ¶¶ 15, 18.) Pursuant to the contract, PZ was obligated to pay Atlantic $30 an hour for all labor it performed and to supply all materials (commonly known as a "time and material contract").  (Pls.' 56.1 ¶ 20.)

Hector Miranda worked as an Atlantic foreman.  (Pls.' 56.1 ¶ 36.)  When Plaintiffs learned of openings at the Jardim Project, they met with Miranda or other foremen who discussed the nature of the work, the workers' taping experience, scheduling, and pay.  (Pls.' 56.1 ¶¶ 35, 42–43, 45.) When hired, Atlantic employees were told that they would work for Atlantic.  (Pls.' 56.1 ¶ 35.)

Generally, the foremen directed and supervised Atlantic's workers, providing instructions, answering questions, and overseeing the completion of tasks.  (Pls.' 56.1 ¶¶ 59, 61, 65.)  The foremen reported to Atlantic owners about the progress of the Jardim Project.  (Pls.' 56.1 ¶ 66.) Atlantic employees would contact foremen about work-related issues.  (Pls.' 56.1 ¶¶ 68–71.)

Because the PZ-Atlantic contract was a time and material contract, PZ wanted work by Atlantic employees done properly so it would not have to pay for additional hours to correct improper or inadequate work.  (Pls.' 56.1 ¶ 83.)  No PZ employee working on the Jardim Project had any formal training or work experience as carpenters or tapers.  (Pls.' 56.1 ¶ 76.)  Yet if they determined that work was not completed properly, PZ employees would speak to Atlantic foremen to correct it.  (Pls.' 56.1 ¶ 84.)  For major quality issues, PZ contacted Acevedo, a co-owner of Atlantic, and sometimes scheduled walkthroughs of the worksite.  (Pls.' 56.1 ¶ 85.)

Atlantic created timesheets for employees to sign in and out and used the timesheets to prepare invoices to send to PZ.  (Pls.' 56.1 ¶ 89.)  As a foreman, Miranda's first task each day was to make sure that the sign-in sheets were placed at the entrance of the worksite.  (Pls.' 56.1 ¶ 90.) Atlantic foremen instructed Atlantic employees to sign the timesheets.  (Pls.' 56.1 ¶ 91.)  Di'Nola would sometimes stand with Miranda and monitor Atlantic employees signing out to ensure there were no false entries.  (Pls.' 56.1 ¶ 92.)  Atlantic foremen kept originals of the timesheets, and Di'Nola kept copies to verify the invoices PZ received from Atlantic.  (Pls.' 56.1 ¶ 94.)  Di'Nola would review the timesheets, and if there were disagreements about the number of hours worked, PZ would address it with Atlantic.  (Pls.' 56.1 ¶¶ 124, 126.)

Newly hired Atlantic employees did not meet or discuss pay issues with PZ employees. (Pls.' 56.1 ¶ 108.)  Atlantic foremen told new employees their hourly wage and that they would receive raises if they did well.  (Pls.' 56.1 ¶¶ 109, 111.)  Some Atlantic employees requested and received raises through Atlantic foremen.  (Pls.' 56.1 ¶¶ 112–13.)  Acevedo, Atlantic's co-owner, approved the raises.  (Pls.' 56.1 ¶ 117.)

On a weekly basis, Atlantic's owners would come to the worksite and distribute envelopes with checks or cash to Atlantic employees.  (Pls.' 56.1 ¶¶ 128–29.)  No Atlantic employee received a check or cash from PZ.  (Pls.' 56.1 ¶ 130.)  Employees generally raised issues regarding pay, namely missing hours, with Atlantic's owners or foremen.  (Pls.' 56.1 ¶ 132.)

After several months, Atlantic was replaced with another subcontractor because it failed to perform sufficiently under the PZ-Atlantic contract.  (Pls.' 56.1 ¶¶ 26–27.)

## B.  Procedural Background

Shortly thereafter, Plaintiffs Gil and Hernandez commenced this putative class or collective action seeking to recover unpaid overtime wages from Atlantic, Acevedo, and the PZ Defendants.

(Compl. [ECF No. 1].)  Plaintiffs Gil and Hernandez allege that they routinely worked more than forty hours per week.  (*See* Am. Compl. ¶¶ 36–49 [ECF No. 30].)  The PZ Defendants answered and asserted cross claims for indemnity and contribution against Atlantic and Acevedo.  (Answer Am. Compl. [ECF No. 33].)  Plaintiffs Gil and Hernandez have since been joined by over thirty opt-in plaintiffs.  (Consent Become Party Pl. [ECF Nos. 37–38, 41–43, 46–49, 51–52, 104, 118].)

The PZ Defendants moved for summary judgment on the ground that they were not Plaintiffs' employers under the FLSA and NYLL.  (Defs.' 56.1 Statement [ECF No. 86]; Mot. Summ. J. [ECF No. 87]; Defs.' Br. [ECF No. 88]; Campoccia Decl. [ECF No. 89]; Ho. Decl. [ECF No. 90].)  Plaintiffs filed an opposition (Harrison Decl. [ECF No. 94]; Juarez Decl. [ECF No. 96]; Portillo Decl. [ECF No. 97]; Familia Decl. [ECF No. 98]; Sarabia Decl. [ECF No. 99]; Pls.' Opp. [ECF No. 100]; Pls.' 56.1 [ECF No. 101]; Aguirre Decl. [ECF No. 107]), and the PZ Defendants filed a reply (Reply [ECF No. 106]; Defs.' 56.1 Reply Statement [ECF No. 105]).

Shortly after this motion was fully briefed, the Court entered default judgment against Atlantic and Acevedo as to liability on Plaintiffs' claims and the PZ Defendants' cross claims for indemnity and contribution.  (Default J. [ECF Nos. 114–15].)

## LEGAL STANDARDS

### A.  Summary Judgment Standard

"Summary judgment is appropriate only when, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 69 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A

fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A material factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court's role here "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It may satisfy this burden "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

If the moving party satisfies its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson*, 477 U.S. at 249). The opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (first quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); then quoting *FDIC v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)). Nevertheless, "if there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party that supports a finding that a material factual dispute exists, summary judgment is improper." *United Rentals (N. America), Inc. v. Conti Enters., Inc.*, 293 F. Supp. 3d 447, 451 (S.D.N.Y. 2018) (citing *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)).

**B.  Joint Employer Standard**

The FLSA imposes liability on any "employer" who violates the FLSA's overtime provisions.  *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 450 (S.D.N.Y. 2019) (citing 29 U.S.C. § 216(b), (e)(2)).  The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  An employer can be "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  *Id.* § 203(a); *see id.* § 203(d).  "An individual may simultaneously have multiple employers for the purposes of the FLSA, in which event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the FLSA."  *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 421 (S.D.N.Y. 2017) (alteration and internal quotation marks omitted).

The Second Circuit has long observed that the FLSA is "written in the broadest possible terms" to "have the widest possible impact in the national economy."  *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984); *see also Falk v. Brennan*, 414 U.S. 190, 195 (1973) (emphasizing the "expansiveness" of the FLSA's definition of employer).  The "striking breadth" of the FLSA's definition of employer "'stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles' in order to effectuate the remedial purposes of the [FLSA]."  *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (first quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); then collecting cases); *accord Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013).

Given the expansive definition of "employer," the Supreme Court "has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA

should be grounded in 'economic reality rather than technical concepts.'" *Barfield*, 537 F.3d at 141 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). "When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme American Envtl. Co., Inc.*, No. 12 Civ. 511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 135 (2d Cir. 1999)). To be held liable as an "employer" under the FLSA, "an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry*, 722 F.3d at 109; *see also Jeong Woo Kim v. 511 E. 5TH St., LLC*, 133 F. Supp. 3d 654, 665 (S.D.N.Y. 2015) (noting that "the overarching concern is whether the alleged employer possessed the power to control the workers in question" (quoting *Moon v. Kwon*, 248 F. Supp. 2d 201, 236 (S.D.N.Y. 2002))).

To determine the economic reality of a particular employment situation, the Second Circuit has identified different sets of factors to consider based on factual circumstances posed by particular cases. *Barfield*, 537 F.3d at 142. Two sets of factors, or tests, are relevant here: one focuses on "formal control" and the other on "functional control." *Martin*, 273 F. Supp. 3d at 422.

The formal control test asks "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry*, 722 F.3d at 104–05 (quoting *Barfield*, 537 F.3d at 142); *accord Herman*, 172 F.3d at 139; *Carter*, 735 F.2d at 12. This test "is useful largely in cases involving claims of joint employment," *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 67 (2d Cir. 2003) (quoting *Danneskjold v. Hausrath*, 82 F.3d 37, 43 (2d Cir. 1996)), because it "bear[s] directly on whether workers who are already employed by a primary employer are also employed by a second employer," *id.* at 68; *accord Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994).

The Second Circuit has made clear that while satisfaction of the formal control factors "can be *sufficient* to establish employment status," it is not *necessary*. *Barfield*, 537 F.3d at 143 (quoting *Zheng*, 355 F.3d at 69). Even if a putative joint employer did not exercise formal control, it may nevertheless have exercised sufficient functional control over a worker to satisfy the FLSA definition of employer. *In re Domino's Pizza Inc.*, No. 16-CV-2492 (AJN)(KNF), 2018 WL 4757944, at *7 (S.D.N.Y. Sept. 30, 2018) (quoting *Zheng*, 355 F.3d at 71)); *see also, e.g.*, *Gordon v. Gen. Prop. Mgmt. Assocs., Inc.*, No. 19-cv-8107 (JGK), 2020 WL 6192818, at *6 (S.D.N.Y. Oct. 22, 2020) (noting that if "formal control does not exist, an entity may nonetheless exercise sufficient functional control to be deemed an employer").

The functional control test asks:

> (1) whether [the putative employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [the putative employers] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [the putative employers].

*Zheng*, 355 F.3d at 72 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 724–25 (1947)); *accord Martin*, 273 F. Supp. 3d at 422. The functional control test is "most relevant in the context of subcontractor relationships." *Fernandez*, 407 F. Supp. 3d at 451 (quoting *Granda v. Trujillo*, No. 18 Civ. 3949 (PAE), 2019 WL 367983, at *5 (S.D.N.Y. Jan. 30, 2019)); *see Greenawalt v. AT & T Mobility LLC*, 642 F. App'x 36, 37–38 (2d Cir. 2016) (summary order).

Several courts in this circuit have recognized that "[t]he definition of employer and analysis for determining whether an employer/employee relationship exists under the NYLL are parallel to that of the FLSA." *Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 261 n.3 (E.D.N.Y. 2018)

(collecting sources). "To be sure, the New York Court of Appeals has not yet resolved whether the NYLL's standard for employer status is coextensive with the FLSA's, but there is no case law to the contrary." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013) (citing *Irizarry*, 722 F.3d at 117). As such, courts routinely apply the same tests to determine whether individuals or entities are joint employers under the FLSA and NYLL. *See Monzano-Moreno v. Libqual Fence Co., Inc.*, No. CV 18-0161 (MKB) (AKT), 2021 WL 730663, at *10 (E.D.N.Y. Feb. 5, 2021) (collecting cases); *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 132 n.19 (S.D.N.Y. 2020) (collecting cases); *Fernandez*, 407 F. Supp. 3d at 452 (collecting cases); *Martin*, 273 F. Supp. 3d at 422 (collecting cases).

The formal and functional control tests "state no rigid rule for the identification of an FLSA employer." *Barfield*, 537 F.3d at 141. Rather, "they provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* (quoting *Zheng*, 355 F.3d at 75–76). Employment for FLSA purposes must ultimately "be determined on a case-by-case basis by review of the totality of the circumstances." *Irizarry*, 722 F.3d at 104.

"The question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations." *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012) (citing *Franco v. Ideal Mortg. Bankers, Ltd.*, No. 07 Civ. 3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011); and *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 190 (S.D.N.Y. 2003)). Because a determination of joint employment is inherently "'fact-intensive,' awards of summary judgment on this issue, although sometimes appropriate, are rare." *Greenawalt*, 642 F. App'x at 37 (citing *Barfield*, 537 F.3d at 143–44); *see also Quintanilla v.*

*Suffolk Paving Corp.*, No. CV 09-5331 (AKT), 2019 WL 885933, at *17 (E.D.N.Y. Feb. 22, 2019);

*Short v. Churchill Benefit Corp.*, No. 14-CV-4561 (MKB), 2016 WL 8711349, at *17 (E.D.N.Y.

Apr. 8, 2016); *Hart*, 967 F. Supp. 2d at 941.[2]

## DISCUSSION

### A. Formal Control

In determining whether the PZ Defendants are employers of the Plaintiffs under the FLSA,

the Court begins by examining the four formal control factors.

#### 1. Hiring and Firing

Under the first factor, the Court considers whether the PZ Defendants had the power to hire

and fire Plaintiffs. *Irizarry*, 722 F.3d at 104–05. The PZ Defendants submit that they did not have

such power. (Defs.' 56.1 ¶ 33.)

As to hiring, Plaintiffs concede that the PZ Defendants did not interview or hire any

Atlantic workers. (Pls.' 56.1 ¶ 33.) Plaintiffs also concede that when Atlantic employees first

arrived at the Jardim Project, they would meet with an Atlantic foreman who would discuss the

nature of the work, scheduling, and pay rates. (Pls.' 56.1 ¶¶ 42–43.)

Plaintiffs seek to make an issue of the fact that the PZ Defendants directed Miranda, an

Atlantic foreman, to hire additional workers and ultimately approved the hiring of new workers.

(Pls.' 56.1 ¶ 47.) They point to Miranda's deposition testimony that, as a foreman, he would hire

---

[2] In their briefs, the PZ Defendants cited and relied on a 2020 rule promulgated by the Department of Labor, *see* 85 Fed. Reg. 2820 (Jan. 16, 2020), codified at 29 C.F.R. §§ 791.1–3, that "narrow[ed] the definition of joint employment under the FLSA," *New York v. Scalia*, No. 1:20-cv-1689-GHW, 2020 WL 5370871, at *1 (S.D.N.Y. Sept. 8, 2020). In *Scalia*, the court vacated this rule, holding that it violated the Administrative Procedure Act. *Id.* at *1, *34. That decision is currently on appeal before the Second Circuit. *New York v. Scalia*, Nos. 20-3806, 20-3815 (2d Cir. appeal docketed Nov. 6, 2020). The PZ Defendants contend that the *Scalia* decision should not impact the merits of the PZ Defendants' arguments and that summary judgment is still proper even under the old rule. (Defs.' Letter [ECF No. 113].) The Court concludes that under the old rule and under the new rule the PZ Defendants are not entitled to summary judgment because there are genuine disputes of material fact. As such, the Court need not address the impact of *Scalia* on the PZ Defendants' arguments.

additional workers "but they would still have to go through [PZ's] office first" and PZ "decide[d] whether somebody was hired."  (Harrison Decl. Ex. G ("Miranda Tr.") 34:23–35:9 [ECF No. 94-7].)  This is not a genuine issue of material fact.

Simply approving new hires does not show sufficient control over the hiring process for this factor to weigh in favor of joint employment.  *See Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013) (finding that a city agency did not have power to hire because although it "dictate[d] the minimum criteria for persons who fill these positions and reviews applicants' resumes to ensure the applicants are qualified, [the contractor] alone decide[d] which qualified applicants to hire"), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014) (summary order).  More direct involvement in the hiring process is necessary for the hiring factor to weigh in favor of formal control.  *See Herman*, 172 F.3d at 140; *Thomas v. River Greene Constr. Grp. LLC*, No. 17 Civ. 6954 (PAE), 2018 WL 6528493, at *7 (S.D.N.Y. Dec. 11, 2018) (alteration omitted) (rejecting argument that the hiring factor does not require defendant to have "directly hired workers"); *see also Morales v. Gourmet Heaven, Inc.*, No. 3:14-cv-01333 (VLB), 2016 WL 6996976, at *5 (D. Conn. Nov. 29, 2016) (finding that individual defendant exercised formal control in part because "he personally hired all managers and supervisory staff"); *cf. Jean–Louis v. Metro. Cable Commc'n, Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) (finding that defendant did not have the power to hire where it did not receive applications from subcontractor's technicians, interview or review applicants, notify applicants that they had been hired, or provide new hires with employment forms).

Plaintiffs also present evidence of several instances where the PZ Defendants directly and indirectly "fired" Atlantic workers.  (Pls.' 56.1 ¶¶ 33, 49–54.)  First, Maddedu (the PZ Senior Project Manager) and Di'Nola (the PZ Project Engineer) directed Miranda to fire Gil because Gil

was "inefficient" and "didn't want to do things the way [Maddedu] did things."  (Miranda Tr. 29:9–30:13.)  Second, there were "a couple of times" where the PZ Defendants ordered Miranda to remove Atlantic employees from the Jardim Project, including once after Di'Nola observed workers playing loud music and dancing on the job.  (Harrison Decl. Ex. A ("Di'Nola 2019 Tr.") 74:25–75:24 [ECF No. 94-1].)  Third, a foreman was removed from the Jardim Project after Maddedu sent an e-mail to Atlantic's owner requesting that the foreman be removed because he was "not following [Maddedu's] directions by sending workers onsite without a logic" and "[t]he results ha[d] not been satisfying."  (Harrison Decl. Ex. D ("Maddedu Tr.") 44:3–46:6 [ECF No. 94-4].)  Fourth, Di'Nola directed lead carpenter Darwin Aguirre to fire two specific individuals.  (Aguirre Decl. ¶ 27 ("I did not want to fire my co-workers, but I had to follow the orders of [Di'Nola], because he—along with [Maddedu] and [Campoccia]—was in charge.").)  Fifth, Di'Nola fired opt-in Plaintiff Misael Portillo because PZ was "cutting people."  (Portillo Decl. ¶¶ 27–30.)  Finally, Di'Nola and Maddedu made lists of Atlantic workers to be fired when the work slowed down and at least two workers on the list ultimately were fired.  (Aguirre Decl. ¶¶ 25–26.)[3]

The PZ Defendants concede that there were times where, consistent with their "general contractor obligations," they requested that certain workers be removed from the job site for creating safety risks or causing scheduling delays due to inadequate work.  (Defs.' 56.1 ¶¶ 49–51; Defs.' Br. 17–18; Reply 3–6.)  In arguing that these actions do not amount to the power to fire, the PZ Defendants rely on a line of cases where courts found that directing a subcontractor to remove

---

[3] Aguirre states that Maddedu fired one of these employees, but as Defendants correctly note (Reply 5 n.5), Aguirre relies on hearsay (*see* Aguirre Decl. ¶ 26 ("Mr.Vidal told me that [Maddedu] was the person who fired him.")).  Because Plaintiffs have failed to show why this hearsay would otherwise be admissible at trial, the Court does not consider this allegation. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985).

workers from a job site or de-authorizing a subcontractor's workers from working on a specific project did not establish the power to fire employees. *See Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298 (PAE), 2017 WL 4877424, at *8–9 (S.D.N.Y. Oct. 27, 2017), *aff'd*, 767 F. App'x 54 (2d Cir. 2019); *Martin*, 273 F. Supp. 3d at 423–25; *Jean–Louis*, 838 F. Supp. 2d at 123–125; *Godlewska*, 916 F. Supp. 2d at 258. Central to each of these decisions, however, was the fact that the defendants did not have the power to terminate the workers' employment with the subcontractor altogether or to prevent the worker from working for another company working on the same project. *See Vasto*, 2017 WL 4877424, at *8–9 (noting that plaintiffs' employer "was permitted to work with other entities" and defendant's "deactivation authority was not absolute"); *Martin*, 273 F. Supp. 3d at 424–25 ("[T]ellingly, plaintiffs do not point to any evidence that Sprint had the power to terminate a field agent's employment at Wallace Morgan or ability to work on any other Wallace Morgan campaign."); *Jean–Louis*, 838 F. Supp. 2d at 124 (noting that the "Metro technician whom Time Warner has prohibited from perform[ing] installation work while employed by Metro may continue working for Metro in some other capacity . . . or leave Metro and later perform installations while working as a technician for another company"); *Godlewska*, 916 F. Supp. 2d at 258 (finding that although defendants could "direct [contractor] to remove the home attendant from the particular patient's case," there was no evidence "that [defendants] ha[d] power, let alone ever exercised power, to require [contractor] to fire a home attendant entirely").

Here, Plaintiffs present evidence that Atlantic workers who were removed from the Jardim Project were fired from Atlantic altogether. (Pls.' 56.1 ¶ 33.) Atlantic workers were largely "hired to work on the [Jardim Project] exclusively" and "never worked for Atlantic anywhere [else]." (Aguirre Decl. ¶ 9; Juarez Decl. ¶ 6; Familia Decl. ¶ 6; Portillo Decl. ¶ 6; Sarabia Decl. ¶ 4.) For example, Misael Portillo was fired by Di'Nola personally "because [the PZ Defendants] were

cutting people." (Portillo Decl. ¶ 27.) When he was removed from the Jardim Project, he was "fired from Atlantic" and "never worked for Atlantic again." (*Id.* ¶¶ 30–31.) In other words, Portillo's removal from the Jardim Project by Di'Nola was a *de facto* firing. *See Fernandez*, 407 F. Supp. 3d at 452; *see also Canh Le v. DirecTV, LLC*, No. 2:16-cv-01369-SVW-AS, 2017 WL 6939087, at *1, *6 (C.D. Cal. Nov. 2, 2017) (finding that defendant had ability to "*de facto* fire" or "constructively discharge [contractor's laborer] by refusing to give him or her work"); *Lemus v. Timberland Apartments, L.L.C.*, No. 3:10–cv–01071–PK, 2011 WL 7069078, at *10 (D. Or. Dec. 21, 2011) (finding power to fire where developers retained "general right to remove [subcontractor's] employees from the job site for safety concerns, a sanction somewhat equivalent to firing here where [developers'] jobs constituted the vast majority of [subcontractor's] work"). Moreover, other Plaintiffs were "fired" by Di'Nola or Maddedu once PZ contracted with another company to complete the taping work. (Aguirre Decl. ¶¶ 34–37; Sarabia Decl. ¶¶ 23–27; Juarez Decl. ¶¶ 23–25.) As the PZ Defendants note, these terminations are hardly "firings" in the traditional sense. But the PZ Defendants fail to explain why they, not Atlantic, effectuated these terminations. Viewed in the light most favor to Plaintiffs, the record permits a reasonable inference that the PZ Defendants had and exercised the power to fire Atlantic employees.

The facts here are further distinguishable from the cases on which the PZ Defendants rely. In *Jean-Louis v. Metropolitan Cable Communications, Inc.*, 838 F. Supp. 2d at 125, for example, the court held that Time Warner had no power to fire technicians of Metro, a cable installation subcontractor, "but instead had the more limited power to de-authorize a technician." In addition to finding that a de-authorization was not a *de facto* firing, the court emphasized that there was no evidence in the record that "Time Warner ever asked, let alone demanded, that Metro actually fire any technician" or that "Metro terminated any employee about which Time Warner specifically

complained, never mind that Metro did so as a matter of course." *Id.* at 125; *see also Godlewska*, 916 F. Supp. 2d at 258 (noting that defendants "never recommended to [the contractor] that a specific home attendant be disciplined" (citing *Jean-Louis*, 838 F. Supp. 2d at 118)).   Here, conversely, there is evidence of several instances where the PZ Defendants directed supervisors to fire Atlantic employees and the supervisors did in fact fire employees about which the PZ Defendants specifically complained.  (*See* Miranda Tr. 29:9–30:13; Di'Nola 2019 Tr. 74:25–75:24; Maddedu Tr. 44:3–46:6; Aguirre Decl. ¶ 27.)

Accordingly, viewed the record in the light most favorable to Plaintiffs, there are triable issues of fact with respect to the first formal control factor—the power to hire and fire.

### 2.  Work Schedules and Conditions

Under the second factor, the Court considers whether the PZ Defendants supervised and controlled Plaintiffs' work schedules or conditions of employment.  *Irizarry*, 722 F.3d at 104–05. Extensive supervision is indicative of an employment relationship "only if it demonstrates effective control of the terms and conditions of the plaintiff's employment."  *Zheng*, 355 F.3d at 74–75 (citing *Rutherford*, 331 U.S. at 726, 730).  Joint employer status may be found even where supervision and control are "exercised only occasionally."  *Herman*, 172 F.3d at 139; *see Barfield*, 537 F.3d at 147 (noting that "the law does not require an employer 'to look over his workers' shoulders every day in order to exercise control'" (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988))).

The facts relevant to this factor are largely disputed by the parties.  The PZ Defendants maintain that they "did not supervise or control Atlantic employee's work schedules or their conditions of employment."  (Defs.' 56.1 ¶ 55; *see also* Defs.' Br. 19–23; Reply 6–9; Campocca

Decl. ¶¶ 24–25).)  But Plaintiffs present evidence to the contrary creating factual disputes that must be tried.  (*See* Pls.' 56.1 ¶ 55.)

Plaintiffs present evidence that the PZ Defendants controlled Plaintiffs' work schedules. The record reflects that Di'Nola ordered Atlantic workers to work specific hours or work late under threat of termination.  (Portillo Decl. ¶¶ 10–11 ("[Di'Nola told me that I could be fired if I did not work twelve (12) hours a day and did not work on Saturdays."); Sarabia Decl. ¶ 9 (same); *see also* Juarez Decl. ¶ 11; Familia Decl. ¶¶ 14–15.)  More specifically, there is evidence that Di'Nola ordered Plaintiffs to work until 7:00 p.m., under threat of being fired, even though Plaintiffs were told by Atlantic when they were hired that they would work until 3:30 p.m.  (Portillo Decl. ¶¶ 9–10; Familia Decl. ¶¶ 11–14.)  Plaintiffs allege that at times Di'Nola would direct certain workers to stay past 7:00 p.m., while allowing others to leave.  (Familia Decl. ¶¶ 18–20.)  The record reflects that Di'Nola also allowed specific employees to come in late as a reward for their good work.  (Sarabia Decl. ¶ 10.)  It is also alleged that Di'Nola even required Atlantic workers to work on Sunday.  (Harrison Decl. Ex. B ("Di'Nola 2020 Tr.") 26:12–28:25 [ECF No. 94-2].)  Finally, the record evidence reflects that the PZ Defendants directed the Atlantic foremen to assign particular hours to the workers.  (Miranda Tr. 104:12–104:17; Aguirre Decl. ¶¶ 17–18 (noting that "[Di'Nola] would tell me what hours to have myself and the other carpenters work").)

Plaintiffs also present evidence that the PZ Defendants controlled the Plaintiffs' timesheets. (*See* Di'Nola 2020 Tr. 15:12–15:24 (testifying that "I was the one keeping the sign-in sheets"); Harrsion Decl. Ex. E. ("Hernandez Tr.") 97:4–97:6 [ECF No. 94-5] (noting that "Di'Nola would be in charge of [timesheets]").)  The record reflects that Di'Nola would monitor the timesheets and often "call the roll" at the exit of the worksite as employees were leaving at the end of the day. (Familia Decl. ¶¶ 18–20.)  Di'Nola himself testified that he personally would sign out employees

at the end of the day.  (*See* Di'Nola 2019 Tr. 103:15–107:9.)  Atlantic workers sometimes contacted Di'Nola directly over issues regarding their hours.  (*See* Harrison Decl. Ex. I. at DEF1399–DEF1401 [ECF No. 94-9].)  Di'Nola admitted that at times he would sign Atlantic employees out after they had left for the day as a "gratuity" or "tip" for their "good work."  (Di'Nola 2020 Tr. 11:2–12:6 ("[T]he cost difference between putting him at 6:00 and at 7:00 is very little among the total, so I think it's a good way to start the relation in a good way . . . .").)  Finally, when Atlantic foremen or supervisors were sick or needed a day off, they would contact Di'Nola or Maddedu personally.  (*See* Aguirre Decl. ¶ 19 (stating that he had to ask Di'Nola if he needed a day off); Di'Nola 2020 Tr. 17:21–18:14 (testifying that Miranda would advise him or Maddedu when he would be absent); *id.* 39:19–40:16 (testifying that Mario Rodas, a "trusted worker," had advised him that he would be absent from work); Harrison Decl. Ex. I at DEF1384 (text message from Miranda to Di'Nola: "I'm sick to my stomach I can't go to work can you tell [Maddedu] please Thanks."); *id.* at DEF 1395 (text message from Miranda to Di'Nola: "I have the flu I don't think I'm going to work tomorrow").)

Plaintiffs also present evidence that the PZ Defendants supervised conditions of employment.  The record reflects that Di'Nola directed Aguirre, as lead carpenter, to provide lists of the Atlantic employees who were working, the location and floor of the building where they were working, and the specific task each employee was assigned.  (Aguirre Decl. ¶ 23; *see id.* Ex. A; *see also* Di'Nola 2020 Tr. 63:25–64:18; *id.* 53:7–54:2 (testifying that Atlantic employees would send him "list[s] of people that were working in a certain hour with understanding — because it was for scheduling, basically and [Maddedu] wanted to understand who was a taper and who was a carpenter").)  Di'Nola also told Aguirre "how to organize the work for the day, including which workers (by name) [he] should have perform certain tasks."  (Aguirre Decl. ¶ 15; *see also id.* ¶ 24.)

Furthermore, Maddedu and Di'Nola would let Miranda know each day what "they wanted to finish and what [he] had to do." (Miranda Tr. 34:3–34:15.) At times, Di'Nola would walk the worksite with Atlantic employees who were given supervisory authority to determine what needed to be done. (Defs.' Reply 56.1 ¶ 142; Di'Nola 2020 Tr. 56:24–57:19.) The PZ Defendants also directed Miranda to assign specific tasks in specific locations to specific workers. (Miranda Tr. 63:13–63:25 (testifying that he "never made th[e] decision" where employees would work); *see also id.* 38:5–38:8 ("Q. Of the Atlantic workers, would you ever decide what workers went on what floor? A. According to [Di'Nola].").) Text messages between Miranda and Di'Nola suggest that Di'Nola closely monitored the status of Atlantic's work. (*See generally* Harrison Decl. Ex. I at DEF1383–DEF1398.)

Plaintiffs also present evidence that the PZ Defendants exerted direct control over Atlantic employees. Newly hired employees of Atlantic were introduced to Di'Nola and told that he "was in charge." (Familia Decl. ¶¶ 4–5; Portillo Decl. ¶¶ 4–5; Aguirre ¶ 4; Juarez Decl. ¶¶ 4–5.) Indeed, Di'Nola would advise new Atlantic employees that he was "the boss." (Portillo Decl. ¶ 5; Juarez Decl. ¶ 5.) Maddedu and Di'Nola personally would tell Atlantic employees where to work and ask them to perform specific tasks. (Juarez Decl. ¶¶ 12–13; Portillo Decl. ¶ 13; Sarabia Decl. ¶¶ 12–13.) Di'Nola, albeit in jest, discussed using soccer cards to signal to Atlantic workers consequences for poor work: first yellow card – one hour unpaid; second yellow card – a half day unpaid; first red card – one day unpaid; and second red card – go home. (Di'Nola 2020 Tr. 12:18–15:10; Harrison Decl. Ex. I at DEF1384.)

Plaintiffs' evidence creates genuine issues of material fact with respect to whether the PZ Defendants supervised and controlled Plaintiffs' work schedules and employment conditions. The record here distinguishes this case from those on which the PZ Defendants rely where courts

granted summary judgment and found that the putative joint employer did not control work schedules.  *Cf. Jean-Louis*, 838 F. Supp. 2d at 126 (finding that Time Warner did not control work schedules where it was "undisputed that Metro tells its technicians when to report in the morning; that technicians contact Metro if they are running late or will be absent; and that no Plaintiff ever contacted Time Warner about those issues").  Defendants rely heavily on *Martin* (Defs.' Br. 20–21); but the degree of control over employee work schedules here is in stark contrast to that in *Martin*.  273 F. Supp. 3d at 425 (finding that defendant did not control work schedules where employees were assigned to particular locations by defendant's subcontractor, notified subcontractor when they were sick or would otherwise miss work, and never spoke to defendant about their jobs, duties, or work hours).

Defendants also rely on *Hugee v. SJC Grp., Inc.*, No. 13 Civ. 0423(GBD), 2013 WL 4399226, at *5 (S.D.N.Y. Aug. 14, 2013).  (Defs.' Br. 22–23.)  There, the court found that a security agency was not a joint employer of a subcontractor's security guard even though the security guard reported to the agency each day upon his arrival to and departure from the worksite and filled out the agency's timesheets.  *Id.* at *5.  In granting the security agency's motion to dismiss, the court also noted that the security guard received "day-to-day instruction about assignments or scheduling" by the subcontractor.  *Id.*  Here, conversely, there is evidence that, in addition to requiring Plaintiffs to sign in and out each day and monitoring the timesheets, the PZ Defendants ordered Atlantic workers to work specific hours and stay late under threat of being fired; permitted specific workers to come in late; required employees to work on Sunday; directed Atlantic to assign certain hours to workers; altered the timesheets; were notified of absences directly by workers; and exerted control over daily assignments.  Put simply, the allegations in *Hugee* do not compare to the evidence Plaintiffs have marshaled.

20

The PZ Defendants argue that they "merely exercise[d] oversight to ensure compliance with safety and security regulations, or to ensure that [the] subcontractor's work was carried out for quality assurance purposes." (Defs.' Br. 19.) The Second Circuit has cautioned courts not to misinterpret this factor to "encompass run-of-the-mill subcontracting relationships," *Zheng*, 355 F.3d at 74, explaining that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement," *id.* at 75 (citing *Moreau v. Air France*, 343 F.3d 1179, 1188 (9th Cir. 2003), *superseded by* 356 F.3d 942 (9th Cir. 2004)). In assessing supervision in contracting and subcontracting arrangements, courts distinguish between "circumstances where the putative joint employer maintains specific standards to which its contractors and the contractors' employees must adhere, and regularly monitors the contractor's employees to ensure that their performance satisfies the putative joint employer's expectations," which alone does not establish control of work conditions, and "circumstances where the putative joint employer is responsible for the day-to-day management of the contractor's employees." *Vasto*, 2017 WL 4877424, at *10 (alterations, ellipsis, and internal quotation marks omitted) (quoting *Lawrence v. Adderley Indus, Inc.*, No. 09 Civ. 2309 (SJF) (ETB), 2011 WL 666304, at *9 (E.D.N.Y. 2011)).

Here, drawing reasonable inferences in Plaintiffs' favor, the record suggests a level of supervision beyond mere quality control and monitoring project completion time and akin to day-to-day management of Atlantic laborers. There is record evidence suggesting that the PZ Defendants monitored Atlantic workers on a daily basis, directed Atlantic foremen to assign specific tasks to particular workers, and personally told Atlantic employees where to work and what tasks to perform. *See Antenor v. D & S Farms*, 88 F.3d 925, 935 (11th Cir. 1996) (alteration

omitted) (noting that "it is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor" (quoting *Aimable v. Long & Scott Farms, Inc.*, 20 F.3d 434, 441 (11th Cir. 1994))); *see also Greenawalt*, 642 F. App'x at 39–40 (reversing grant of summary judgment and finding that supervision factor did not weigh against joint employment where "plaintiffs' day-to-day work was supervised mostly by [putative joint employer's] store managers").

The Court recognizes, as the PZ Defendants argue (Defs.' Br. 19; Reply 6), that general contractors may oversee the work of subcontractors to ensure work is satisfactory and to keep the project on schedule. *Zheng*, 355 F.3d at 74–75. But there are limits. In the context of contractor and subcontractor relationships, factual disputes concerning a putative joint employer's degree of supervision over employment conditions and control over scheduling precludes a finding that, as a matter of law, this factor weighs against joint employment. *See Murillo v. Coryell Cty. Tradesmen, LLC*, No. 15-3641, 2017 WL 2780750, at *10 (E.D. La. June 27, 2017) (finding genuine issue of material fact over whether contractor controlled schedules and supervised conditions of subcontractor's employees given evidence that contractor determined what work would be done, had authority to order employees to stop working, and monitored employees on the job and when signing in and out); *Reinoso v. A G C Consulting Civil Eng'rs*, NO. 12-23461-CIV, 2015 WL 12533085, at *5–6 (S.D. Fla. Oct. 7, 2015) (finding factual disputes regarding supervision where "[contractor's] representatives directly instructed [plaintiffs]" and "played a role in recording the time they worked," rejecting argument that contractor "merely . . . provided general instructions or checked quality"); *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1062–63 (D. Or. 2010) (finding that supervision and control factor weighed in favor of joint employment where defendants controlled which project sites contractor's work crews were

22

assigned to and required laborers to track their work on sheets provided by defendants, even though defendants did not tell laborers when to report to work, when their workday ended, or what days to work).

Accordingly, given the genuine factual disputes and drawing all reasonable inferences in Plaintiffs' favor, a jury could reasonably find that the second formal control factor—supervision and control over work schedules and employment conditions—supports a finding of joint employment.

### 3.  Rates and Methods of Payment

Under the third factor, the Court considers whether the PZ Defendants determined Plaintiffs' rate and method of payment. *Irizarry*, 722 F.3d at 104–05.  "[T]he test is whether a putative joint employer determines pay rates, not whether it affects them." *Jean–Louis*, 838 F. Supp. 2d at 129–30.

It is undisputed that the PZ Defendants did not exercise control over the method of payment.  On a weekly basis, Atlantic's owners would come to the worksite and distribute envelopes with checks or cash to Atlantic employees.  (Pls.' 56.1 ¶¶ 128–29.)  No Atlantic employee received a check or cash from PZ.  (Pls.' 56.1 ¶ 130.)

With respect to the rates of payment, it is undisputed that pursuant to the PZ-Atlantic contract, PZ was required to pay Atlantic $30 per hour for all labor supplied.  (Pls.' 56.1 ¶ 20.)  Atlantic submitted invoices supported by the timesheets showing how much each employee worked.  (Pls.' 56.1 ¶ 122.)  When reviewing the invoices, PZ consulted the timesheets to ensure that the invoices accurately captured the number of hours worked.  (Pls.' 56.1 ¶ 123.)  PZ issued back charges if Atlantic needed to redo work or fell behind schedule, but the PZ Defendants did not direct Atlantic to deduct hours from Plaintiffs' pay for such back charges.  (Pls.' 56.1 ¶ 125.)

Plaintiffs argue that the PZ Defendants controlled the rate of payments by refusing to pay Atlantic for some hours its employees worked and by capping payment to Atlantic for labor at $30 per hour.  (Opp. 13.)  Evidence in the record suggests that Di'Nola declined to approve certain hours of particular Atlantic employees, thereby depriving them from receiving payment from Atlantic for those hours.  (*See* Miranda Tr. 40:11–41:17 (testifying that Di'Nola "would decide to take hours out" if an employee "didn't do his job well" causing Atlantic not to pay the employee for the hours worked); *id.* 86:22–87:7 ("[Di'Nola] would take hours from the total.").)  Indeed, some Plaintiffs maintain that they did not receive pay for all the hours that they worked (Sarabia ¶ 21; Juarez Decl. ¶ 21), though it is unclear whether this was caused by Di'Nola's deductions.

In *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d at 144–45, the Second Circuit recognized that a putative joint employer that pays a contractor based on the number of hours the contractor's employees work may ultimately determine the amount of payment the employees receive from the contractor.  *Accord Jean-Louis*, 838 F. Supp. 2d at 129.  In *Barfield*, the court found that a hospital that calculated nurses' hours and paid referral agencies based on the calculations exerted control over the nurses' pay.  537 F.3d at 144.  The court explained that the hospital's "calculations conclusively determined the number of hours for which [the nurses] would be paid."  *Id.*  The court recognized that "the hourly rate [the hospital] paid the referral agencies effectively set a cap on the hourly rate that the agencies would pay [nurses]."  *Id.* at 144–45.

This case is on all fours with *Barfield*.  PZ calculated the number of hours Atlantic employees worked and paid Atlantic based on those calculations.  Atlantic then used the calculations to pay its employees.  *Cf. Jean-Louis*, 838 F. Supp. 2d at 129–30.  The evidence supports an inference that PZ's calculations conclusively determined the pay received by Atlantic employees.  In addition, the $30-per-hour rate that PZ paid Atlantic for *all* labor ultimately set a

cap on how much Atlantic could pay its laborers.  *See Fernandez*, 407 F. Supp. at 455.  In these circumstances, the third factor is typically "inconclusive."  *Barfield*, 537 F.3d at 145; *Fernandez*, 407 F. Supp. at 455.

Accordingly, viewed in the light most favorable to Plaintiffs, the third factor—rates and methods of payment—is inconclusive and thus does not decisively weigh against joint employment.

### 4.   Maintenance of Employment Records

Under the fourth factor, the Court considers whether the PZ Defendants maintained Plaintiffs' employment records.  *Irizarry*, 722 F.3d at 104–05.  The "employment records on the matter most relevant to overtime obligations under the FLSA" are those relating to "hours worked."  *Barfield*, 537 F.3d at 144.  Evidence in the record reflects that PZ maintained time records for Atlantic employees who worked on the Jardim Project.  (Di'Nola 2019 Tr. 60:11–61:6 (testifying that he maintained copies of Atlantic employees' timesheets during the Jardim Project through the commencement of this action); *see also* Di'Nola 2020 Tr. 15:22–15:24.)

Here, the record reflects that the PZ Defendants "sign[ed] off on" plaintiffs' timesheets, "verif[ied] the number of hours worked," and "provide[d] records of the hours worked" to Atlantic, which used the records to compensate Plaintiffs on a per-hour basis—the same situation in *Barfield* where there was "no question" that this factor weighed in favor of joint employment.  537 F.3d at 136, 144; *see Westside Drywall*, 709 F. Supp. 2d at 1063 (finding that maintenance of records weighed in favor of joint employment given "evidence that Defendants required the claimants to track their work on time sheet worksheets, and that the claimants were required to turn these documents in to [the putative joint employer]"); *see also Lemus*, 2011 WL 7069078, at *15 ("By collecting the equivalent of JC Builders' payroll information and tracking how many workers it

25

had on the job, Polygon differentiated itself from a typical general contractor, who has no access to subcontractor employment records."); *cf. Jean-Louis*, 838 F. Supp. 2d at 130.

Accordingly, viewed in the light most favorable to Plaintiffs, a jury could reasonably find that the fourth formal control factor—maintenance of employment records—supports a finding of joint employment.

*     *     *

Considering the four formal control factors, the PZ Defendants have failed to meet their burden to prevail on summary judgment. The record is riddled with genuine disputes of material fact that bear directly on the formal control analysis, precluding a finding that the PZ Defendants did not exercise formal control over Plaintiffs. *Cf. Vasto*, 2017 WL 4877424, at *12 (finding no formal control by putative joint employer where first, second, and fourth factors weighed against finding of joint employment while third factor was inconclusive); *Godlewska*, 916 F. Supp. 2d at 262 (same).[4]

## B.  Functional Control

Even if there were no factual disputes with respect to the formal control test and the PZ Defendants demonstrated that, as a matter of law, they did not exercise formal control over Plaintiffs, that is not the end of the analysis. To be entitled to judgment as a matter of law, the PZ Defendants must demonstrate that they "neither formally nor functionally controlled" Plaintiffs— *i.e.*, that they were not employers under the formal control test *and* the functional control test. *Vasto*, 2017 WL 4877424, at *16; *Martin*, 273 F. Supp. 3d at 434, 439; *see Zheng*, 355 F.3d at 69

---

[4] Separate from their primary, general arguments, the PZ Defendants briefly argue that Di'Nola and Campoccia should not be deemed employers. (Defs.' Br. 24.) Based on the Court's review of the record, the evidence concerning Campoccia appears to be limited. The PZ Defendants, as the movants who bear the burden to show that they are entitled to summary judgment, did not attempt to differentiate clearly Campoccia from PZ and Di'Nola. The Court declines to do so here. In any event, as discussed below, even if the Court found that Campoccia did not exercise formal control, summary judgment would not be appropriate. *See infra* Discussion, Section B.

(noting that the FLSA "demands that a district court look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA").  Despite relying on several cases that make this point plain, the PZ Defendants did not brief the functional control test or otherwise attempt to show that they did not exercise functional control over Plaintiffs.  (*See generally* Defs.' Br.; Reply; Defs.' 56.1.)  Accordingly, as the moving party, they have necessarily failed to meet their burden and therefore cannot be entitled to summary judgment.  *See Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 679 (S.D.N.Y. 1995) ("[B]ecause the parties did not brief the issue, and because the burden is on the movant at summary judgment, the Court denies defendant's motion with regard to the state claim."); *see also Bloom v. Town of Stratford*, No. 3:05cv217 (PCD), 2006 WL 3388396, at *9 (D. Conn. Nov. 16, 2006) ("Defendants do not specifically brief this issue and therefore, summary judgment will not be entered . . . .").

The PZ Defendants rely heavily on *Matter of Ovadia v. Office of the Industrial Board of Appeals*, 19 N.Y.3d 138, 143–45, 969 N.E.2d 202, 946 N.Y.S.2d 86 (2012), in the context of formal control.  While *Ovadia* concerned the functional control test, the point the PZ Defendants seek to make about the potential impact on the construction industry bears comment.  In *Ovadia*, the New York Court of Appeals disapproved of the application of a couple of the functional control factors to a construction-related contractor-subcontractor relationship. 19 N.Y.3d at 143–45.  Specifically, the court noted that consistent application of certain considerations "in the construction realm[] would likely render most general contractors the joint employers of their subcontractors' employees—a proposition that does not reflect the actual relationships in the construction industry."  *Id.* at 144.  Yet *Ovadia* explicitly cautioned that its "holding should not be misconstrued

27

as a conclusion that a general contractor in a construction setting can never be an employer of its subcontractor's employees." 19 N.Y.3d at 145.

The PZ Defendants contend that finding joint employment in this case "would turn the construction industry on its head and dramatically increase the liability of general contractors in the construction industry." (Defs.' Br. 2.) "That the general contractor-subcontractor relationship . . . remains prevalent in the relevant industry has no bearing on whether entities codetermine the essential terms and conditions of a worker's employment and, therefore, constitute joint employers for purposes of the FLSA." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 143–44 (4th Cir. 2017). As the Second Circuit has explained, "the prevalence of an industry-wide custom is subject to conflicting inferences. While, on the one hand, it may be 'unlikely' that a prevalent action is 'a mere subterfuge to avoid complying with labor laws,' on the other hand, the very prevalence of a custom may 'be attributable to widespread evasion of labor laws.'" *Barfield*, 537 F.3d at 146 (quoting *Zheng*, 355 F.3d at 73–74).

In any event, the PZ Defendants' concerns are unfounded. Joint employment is "determined on a case-by-case basis by review of the totality of the circumstances." *Irizarry*, 722 F.3d at 104. In the construction industry, or any other industry, where "a general contractor contracts work out to a subcontractor that directly employs workers, the general contractor will face no FLSA liability so long as it . . . disassociates itself from the subcontractor with regard to the key terms and conditions of the workers' employment." *Salinas*, 848 F.3d at 149 (citing *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 409 (7th Cir. 2007)); *see Zheng*, 355 F.3d at 70, 72.

To make clear, the Court does not hold that the PZ Defendants were Plaintiffs' employers. Rather, the Court finds only that there are genuine issues of material fact that preclude summary judgment on this issue.

## <u>CONCLUSION</u>

For the reasons discussed above, the PZ Defendants' motion for summary judgment is DENIED.  Plaintiffs shall file their anticipated motion for class certification, for certification of a collective action, or both on or before April 13, 2021.  (*See* Scheduling Order [ECF No. 77].)

The Clerk of Court is respectfully requested to terminate docket entry 87.


**SO ORDERED.**

**Date:  March 29, 2021**                                   **MARY KAY VYSKOCIL**
      **New York, NY**                                       **United States District Judge**